UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| PHYLLIS STEWART, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 1:24-cv-01553-JRO-MKK |
| | ) | |
| FCA US LLC, | ) | |
| | ) | |
| Defendant. | ) | |

## ORDER GRANTING MOTION FOR SUMMARY JUDGMENT

Plaintiff Phyllis Stewart alleges that FCA US LLC ("FCA"), her former employer, violated 42 U.S.C. § 1981 and the Americans with Disabilities Act ("ADA") when it terminated her employment. FCA has filed a motion for summary judgment, arguing that Stewart was fired due to absenteeism and not for any discriminatory purpose. Dkt. [79]. Based on the undisputed material facts, that motion is **GRANTED**.

## I. FACTS & BACKGROUND

Stewart did not respond to FCA's motion for summary judgment, despite FCA providing her notice of the importance of doing so. Dkt. 82. Accordingly, the Court recounts FCA's undisputed material facts that are supported by the record. *Keeton v. Morningstar, Inc.*, 667 F.3d 877, 880 (7th Cir. 2012).

**A.    Facts**

FCA is an automotive manufacturer with multiple manufacturing facilities in Kokomo, Indiana. Dkt. 80-4 at 1. Stewart is a forty-one-year-old Black woman previously employed by FCA. Dkt. 80-1 at 6, 13. She began working at

FCA in 2013 as a die-caster at the Kokomo Casting Plant ("KCP"). *Id.* at 7. Stewart was represented by the labor union United Auto Workers – Local 1166, and her employment was governed by the terms of the national and local labor agreements negotiated between FCA and the union. Dkt. 80-4 at 1–2, 20.

In 2016, Stewart started experiencing anxiety. Dkt. 80-1 at 21.

### 1.    Initial workplace conflicts

At some point before 2021, Stewart transferred rows in the plant so that she worked on the same rows as LaTasha Fowler, her cousin. Dkt. 80-1 at 17–18. At that time, Stewart was in charge of operating two die-cast machines on the day shift and had no issues with her co-workers. *Id.* at 17–18, 27. Fowler, however, had interpersonal issues with many people in her row, including a group of women, consisting mostly of White women and one Black woman. *Id.* at 17. Other workers were messing with Fowler's locker and taking things from her workstation. *Id.* Fowler also had issues with a group of White men. *Id.* at 18. Stewart believes race was at the heart of her co-workers' issues with Fowler, testifying that "[t]heir issue with my cousin is because she's a smart, Black, strong woman." Dkt. 80-2 at 11. When Stewart joined Fowler's row, other employees on the row learned she and Fowler were cousins. Dkt. 80-1 at 17. Stewart believes her co-workers began imputing their dislike of Fowler onto her at this time. *Id.*

### 2.    2021 incident

On October 15, 2021, Stewart found a rope hanging on one of her machines. Dkt. 80-3 at 7–8. She described the rope as a "hanging noose." Dkt.

80-1 at 14, 19.  Stewart's supervisor, Tony Ferris, came to her station and saw the noose on her assigned machine.  Dkt. 80-2 at 5.  Stewart told Ferris the rope on her workstation was a hate crime.  *Id.*  He offered to allow her to go home for the day, but Stewart declined; "I wasn't leaving because I'm not no coward."  *Id.*  Stewart does not know who placed the rope, *id.,* but she suspects she was targeted out of dislike for Fowler, dkt. 80-1 at 17.  After this incident, Stewart developed sleep terrors.  *Id.* at 22.

### 3.    2022 incident

On August 11, 2022, Stewart was involved in a frightening incident.  Dkt. 80-2 at 28.

When Stewart arrived at work that day, one of her die-cast machines was shut down.  Dkt. 80-1 at 19.  She decided to clean it, which required entering the machine's production cell, an enclosed area containing a furnace and a robot.  *Id.*  When the machine is running, it is dangerous to be inside the cell.  *Id.*  When Stewart entered the cell to clean the machine, someone shut the door to the cell and locked it.  *Id.* at 20.  Stewart began recording video on her phone.  *Id.*  Per the video timestamps, she was locked inside the cell for 76 seconds.  *Id.* at 8.  Then an FCA contractor let her out.  *Id.* at 20.  Stewart could not clearly see the contractor due to dirt on the cell window's glass, and she could not later identify him.  *Id.*

After exiting the cell, Stewart began inspecting the outside locking mechanism.  *Id.* at 24.  But she was interrupted by people rushing up to her, asking what had happened, which overwhelmed her.  *Id.*  Stewart was crying and

3

at some point blacked out.  *Id.*  She was taken to Medical where the nurse worked.  *Id.*  In the nurse's office, she relayed the incident to a number of FCA employees, including her supervisor, her team leader, her union representative, an HR representative, the nurse, and others.  *Id.*

Stewart left Medical and the KCP plant altogether that day.  She recalls crying, driving home, and thinking that she would not be going back to FCA's KCP parking lot again.  Dkt. 80-2 at 7.

### 4.    Post-incident events

After Stewart was locked in the machine cell, she experienced what she described as a "nervous breakdown."  Dkt. 80-1 at 22.  The incident exacerbated her pre-existing anxiety and caused her to develop depression and "severe" post-traumatic stress disorder.  Dkt. 80-1 at 22; Dkt. 80-3 at 23–26.  Stewart applied for and received medical disability leave on August 14, 2022.  Dkt. 80-4 at 2. She received some percentage of her full pay from FCA while she was on leave. Dkt. 80-1 at 14.

While on leave, Stewart filed a complaint with the Indiana Civil Rights Commission claiming FCA discriminated against her on the basis of her race when she was locked in the machine cell; she also alleged FCA failed to investigate the incident.  Dkt. 80-3 at 13–14.  The Indiana Civil Rights Commission issued a "no probable cause" finding.  Dkt. 80-1 at 32.  She also filed a charge of employment discrimination with the U.S. Equal Employment Opportunity Commission, which deferred to the Indiana Civil Rights Commission's determination.  Dkt. 80-3 at 18.  Stewart also contacted the

4

NAACP and the Indiana Department of Occupational Safety and Health. Dkt. 80-2 at 16. Neither entity took actions to help Stewart. *Id.*

FCA investigated Stewart's report of being locked in the machine cell. Dkt. 80-4 at 2. Investigators identified no witnesses. *Id.* They were unable to corroborate the events as Stewart described. *Id.*; *see also id.* at 7.

### 5. ADA request, release to return to work, and termination

On January 16, 2024, Stewart wrote to the FCA human resources and labor relations representative, requesting a transfer to one of two other FCA plants in Kokomo as an accommodation under the ADA. Dkt. 80-3 at 21–22. The HR representative wrote back and asked Stewart to have her doctor complete ADA paperwork on Stewart's behalf. *Id.*

Stewart provided FCA with the completed form. Her doctor wrote on January 29 that Stewart "cannot function in current work environment due to traumatic event," dkt. 80-3 at 24, and that "[a] traumatic event has caused severe PTSD and causes recurrent panic attacks when associated with her workplace," *id.* at 25. The doctor did not expressly indicate Stewart's transfer was medically necessary, dkt. 80-4 at 3, but wrote that "[i]f employee switched facilities, she could resume all work functions," and "[s]he would benefit from being in a different facility," dkt. 80-3 at 24.

FCA's HR representative stated that Stewart's transfer to a different facility presented "potential" issues under the labor union's collective bargaining agreement. Dkt. 80-4 at 3. The HR representative had to consult with corporate labor relations to determine whether Stewart's request was "allowed and

5

appropriate" under the agreement. *Id.* While FCA worked through these considerations, it expected Stewart to return to work at KCP. *Id.*

FCA continued to evaluate Stewart's accommodation request. On February 28, per FCA's request, Stewart provided FCA with a medical record release so FCA could contact her doctor in a "peer-to-peer" call. Dkt. 80-3 at 31. On March 19, an FCA nurse practitioner conducted the "peer-to-peer" call with Stewart's doctor to discuss her accommodation request. Dkt. 80-4 at 3, 15–16.

On March 1, 2024, FCA received Stewart's reinstatement paperwork in which her doctor stated Stewart could "return to work with no restrictions on March 4, 2024." *Id.* at 3; Dkt. 80-3 at 29. That same day, Stewart emailed the FCA HR representative and asked if she needed to return to KCP since she had requested work at a different location. Dkt. 80-3 at 32. FCA replied that Stewart's accommodation request was still being reviewed and that Stewart "would return to work at KCP." *Id.* at 33. Stewart did not respond to inform FCA that she would not or could not return to KCP. *Id.* But Stewart texted the employee assistance representative that day and told him she would "have no other choice to point out," dkt. 80-3 at 39, meaning she would not return to casting, dkt. 80-2 at 26.

On March 4 and each day that week, Stewart "called in" absent for personal reasons. *Id.* at 24; Dkt. 80-4 at 18. In accord with FCA policy, FCA mailed Stewart a letter requiring her to report to the employment office or provide evidence of the reason for her absence by March 20. Dkt. 80-4 at 3; Dkt. 80-3 at 35. Stewart did not receive this letter. Dkt. 80-2 at 24.

6

Stewart neither returned to KCP nor explained her absence.  Dkt. 80-4 at 3.  She testified that she understood that she took the first step toward reinstatement, going to plant medical and being seen by a doctor.  Dkt. 8-2 at 23.  To finish reinstatement, "you go to work," Stewart testified.  *Id.*  Stewart never took this final step to reinstate.  *Id.*  (Q. "[D]id you know [on March 1] you were not going to reinstate at KCP?" A. "Yes . . . .").

FCA terminated Stewart's employment on March 20, 2024.  Dkt. 80-3 at 36.  FCA maintains her termination was based on Stewart's failure to report to work.  Dkt. 80-4 at 3.  This lawsuit followed.

**B.    Procedural History**

Stewart sued FCA, bringing the following claims: discrimination under the ADA (Count I), failure to accommodate under the ADA (Count II), interference under the ADA (Count III), retaliation under the ADA (Count IV), and discrimination on the basis of race under 42 U.S.C. § 1981 (Count V).  Dkt. 1.  After discovery, FCA moved for summary judgment.  Dkt. [79].  In support of its motion, FCA attached excerpts of Stewart's deposition transcript and exhibits, dkts. 80-1, 80-2, & 80-3; the declaration of FCA HR representative Stacy Sullivan and its exhibits, dkt. 80-4; and excerpts of Anthony Ferris's deposition, dkt. 80-5.  As required by Local Rule 56-1(k), Defendant provided Stewart with a notice regarding her right to respond and submit evidence in opposition to the motion for summary judgment.  Dkt. 82.  Yet Stewart filed no response to FCA's motion, and the time to do so has long since passed.

## II. SUMMARY JUDGMENT STANDARD

A motion for summary judgment asks the Court to find that a trial is unnecessary because there is no genuine dispute as to any material fact and, instead, the movant is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a); *see also Palmer v. Franz*, 928 F.3d 560, 563 (7th Cir. 2019). "A genuine issue of material fact exists when the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Wells v. Coker*, 707 F.3d 756, 760 (7th Cir. 2013) (cleaned up). The Court "view[s] the record in the light most favorable to the nonmoving party and draw[s] all reasonable inferences in that party's favor." *Zerante v. DeLuca*, 555 F.3d 582, 584 (7th Cir. 2009). A court has to consider only the materials cited by the parties. *See* Fed. R. Civ. P. 56(c)(3). It need not "scour the record" for evidence that might be relevant. *Grant v. Trs. of Ind. Univ.*, 870 F.3d 562, 573–74 (7th Cir. 2017); *see also* S.D. Ind. L.R. 56-1(h).

A party seeking summary judgment must inform the district court of the basis for its motion and identify the record evidence it contends demonstrates the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Whether a party asserts that a fact is undisputed or genuinely disputed, the party must support the asserted fact by citing to particular parts of the record, including depositions, documents, or declarations. Fed. R. Civ. P. 56(c)(1)(A).

Local Rule 56.1(f) says that in deciding summary judgment motions, the Court will assume

8

> (1) the facts as claimed and supported by admissible evidence by the movant are admitted without controversy except to the extent that:
>
> > (A) the non-movant specifically controverts the facts in that party's "Statement of Material Facts in Dispute" with admissible evidence; or
> >
> > (B) it is shown that the movant's facts are not supported by admissible evidence; or
> >
> > (C) the facts, alone or in conjunction with other admissible evidence, allow the court to draw reasonable inferences in the non-movant's favor sufficient to preclude summary judgment . . . ."

"[W]hen a party fails to comply with the local rule requiring a response to a statement of undisputed material facts, the court may rely on the opposing party's statement to the extent that it is supported by citations to relevant evidence in the record." *Keeton v. Morningstar, Inc.*, 667 F.3d 877, 880 (7th Cir. 2012) (citing *FTC v. Bay Area Business Council, Inc.*, 423 F.3d 627, 634 (7th Cir. 2005)).

## III. DISCUSSION

FCA is entitled to summary judgment because Stewart is not a "qualified individual" under the ADA, her termination was not caused by racial or disability discrimination, and her termination was not caused by retaliation or a motive to interfere with her statutorily protected activity of seeking an accommodation for her disability.

### A.    Qualified Individual

For her discrimination and failure to accommodate claims to proceed under the ADA, Stewart must produce enough evidence for the jury to find the threshold fact that she was a "qualified individual" under the ADA. *Shell v.*

*Burlington N. Santa Fe Ry. Co.*, 941 F.3d 331, 335 (7th Cir. 2019) (discrimination); *Conners v. Wilkie*, 984 F.3d 1255, 1261 (7th Cir. 2021) (failure to accommodate).

FCA argues that Stewart has not shown she is a "qualified individual" under the ADA.  The ADA defines a "qualified individual" as "an individual who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires."  42 U.S.C. § 12111(8).  The ability to attend work is an essential function of the job.  *Nowak v. St. Rita High Sch.*, 142 F.3d 999, 1003 (7th Cir. 1998); *see Waggoner v. Olin Corp.*, 169 F.3d 481, 483 (7th Cir. 1999) ("[G]enerally attendance is a requirement of a job. Not surprisingly, courts are in agreement on this point.").  The plaintiff bears the burden of establishing that she is a "qualified individual." *Stanley v. City of Sanford*, 606 U.S. 46, 54 (2025).  When a plaintiff is no longer able to perform the functions of the job they have and instead request transfer, the plaintiff has the burden of proving the existence of a vacant position for which she is qualified.  *Conners*, 984 F.3d at 1262.

Stewart has not shown she could perform the essential functions of her die-caster position at KCP with or without a reasonable accommodation.  Per her own doctor's note, "[s]he cannot function in current work environment due to traumatic event," dkt. 80-3 at 24, and "[a] traumatic event has caused severe PTSD and causes recurrent panic attacks when associated with her workplace," *id.* at 25.  Stewart also testified more than once that she would not return to work at KCP.  Dkt. 80-2 at 7 ("I knew I wasn't going to be back"); *id.* at 22.  Her

inability to work at KCP necessarily means she could not perform the essential functions of her die-caster position at KCP. *See Nowak,* 142 F.3d at 1003; *Waggoner,* 169 F.3d at 483.

Because Stewart could not perform the essential functions of the job she held, she is a "qualified individual" under the ADA *only if* she could perform the essential functions of a position she desired to hold, that is, a vacant position at another plant. It is Stewart's burden to prove the existence of a vacant position for which she was qualified. *Conners,* 984 F.3d at 1262. Stewart has not designated any evidence for summary judgment, so she has not put forth any evidence of a vacant position into which she could have transferred. And on the Court's review, the summary judgment record does not show that a vacant position was available for Stewart. *See* dkt. 80-4 at 3.

Because she cannot perform the essential functions of her job and there is no record of a vacant job at FCA she desired and could perform, Stewart cannot show that she is a "qualified individual" under the ADA. Accordingly, summary judgment for FCA is **GRANTED** as to Counts I and II.

## B.    Discrimination

Stewart brought two counts of discrimination, the first on the basis of disability, dkt. 1 ¶ 20, and the second on the basis of race, *id.* ¶ 28. In the end, these claims boil down to "whether the evidence would permit a reasonable factfinder to conclude that the plaintiff's race . . . or other proscribed factor caused the discharge or other adverse employment action" after considering the relevant evidence "as a whole." *Ortiz v. Werner Enters., Inc.,* 834 F.3d 760, 764–

66 (7th Cir. 2016); *see Dickerson v. Bd. of Trs. of Cmty. Coll. Dist. No. 522*, 657 F.3d 595, 600 (7th Cir. 2011) ("[C]ourts often look to the Civil Rights Act for ADA guidance.").  In other words, Stewart must show that race or disability "was a but-for cause of [her] injury," considering the evidence as a whole.  *See Lewis v. Indiana Wesleyan Univ.*, 36 F.4th 755, 759 (7th Cir. 2022) (citing *Comcast Corp. v. Nat'l Ass'n of Afr. Am.-Owned Media*, 589 U.S. 327, 333 (2020)).

### 1.    *McDonnell Douglas* Burden-Shifting Approach

FCA presents arguments under the *McDonnell Douglas* burden-shifting approach, which remains an efficient way to frame evidence in discrimination cases.  *Napier v. Orchard Sch. Found.*, 137 F.4th 884, 891 (7th Cir. 2025) ("As long as the court considers the evidence as a whole, it may also use the *McDonnell Douglas* framework as a supplemental tool." (quoting *Tyburski v. City of Chicago*, 964 F.3d 590, 599 (7th Cir. 2020)).  To establish her prima facie case under this framework, Stewart must show that she (1) belonged to a protected class, (2) met FCA's legitimate expectations, (3) suffered an adverse employment action, and (4) was similarly situated to other employees who were not members of the protected class and who were treated better.  *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973).  If Stewart makes out a prima facie case, the burden shifts to FCA to give a legitimate, non-discriminatory reason for the adverse employment action.  *Id.*  If FCA does so, the burden shifts back to Stewart to present evidence that the defendant's explanation was pretext for unlawful discrimination.  *David v. Bd. of Trs. of Cmty. Coll. Dist. No. 508*, 846 F.3d 216, 225 (7th Cir. 2017).

First, Stewart has shown she belongs to a protected racial class—she is Black—but not a protected class under the ADA, as discussed in Section III.A above. It is a given that FCA took an adverse employment action against her when terminating her decade-long employment in 2024.

Next, because she has designated no evidence in opposition to FCA's motion for summary judgment, Stewart has not identified any similarly situated employees who received better treatment. While Stewart identified other employees who observed nooses at their workstation or were briefly locked in their machine cells, dkt. 80-2 at 6, 14–15, she does not say FCA treated them any better than it treated Stewart.

Lastly, the undisputed facts also show that Stewart was not meeting FCA's legitimate expectations at the time of her termination. FCA expected Stewart to return to work at KCP on March 4, 2024, after plant medical cleared her to return to work. Dkt. 80-3 at 33. Stewart did not report to work as expected. Instead, she called out from work five days in a row, a decision she knew would cause her to "point out." Dkt. 80-3 at 39. The Seventh Circuit has repeatedly held that absenteeism can constitute a failure to meet the company's legitimate expectations. *Contreras v. Suncast Corp.*, 237 F.3d 756, 761 (7th Cir. 2001); *McDuffy v. Fed. Exp. Corp.*, 130 F. App'x 49, 50 (7th Cir. 2005); *Harper v. C.R. England, Inc.*, 687 F.3d 297, 311 (7th Cir. 2012).

Because of Stewart's absenteeism without explanation after her reinstatement, she was not meeting FCA's legitimate expectations and therefore cannot make out a prima facie case of discrimination. Even if she could, FCA

has presented a non-discriminatory reason for her termination, namely, her absenteeism. Dkt. 80-4 at 3. And without Stewart's response in opposition to FCA's motion for summary judgment, the Court sees no evidence that this reason was pretextual. In sum, based on the undisputed facts presented in FCA's motion, no reasonable jury proceeding under the *McDonnell Douglas* approach could find FCA discriminated against Stewart on the basis of race or disability when it terminated her.

### 2. *Ortiz*'s Holistic Approach

The Court reaches the same conclusion even without framing the evidence under *McDonnell Douglas*.

The record includes evidence of two incidents involving Stewart: a hanging noose on her machine in 2021, and being locked in her production cell in 2022. Stewart testified that both of these incidents were the result of escalating racial tension between her and her White colleagues. Dkt. 80-1 at 17; Dkt. 80-2 at 11. Viewing the facts in the light most favorable to Stewart, these could reasonably be seen as racially charged incidents. *See Porter v. Erie Foods Int'l, Inc.*, 576 F.3d 629, 635–36 (7th Cir. 2009) (observing that a noose "is a visceral symbol" of anti-Black sentiment in America).

That said, Stewart cannot identify who was responsible for either incident. And nothing in the record suggests those responsible for either the noose or machine cell incidents had any connection to FCA's decision-making regarding Stewart's ADA accommodation request or her eventual termination.

14

Ultimately, then, these events are too attenuated from her termination in 2024 to evince discrimination.  Stewart conceded this point in her deposition:

> Q: Do you believe you were fired because of your race?
> A: Yes, in my heart I do.
> Q: Okay. Why do you feel that way?
> A: Because this wouldn't never happen if it was a white person.
> Q: You wouldn't have been fired if you were a white person?
> A: Nope, and they would have found out exactly who did this to them.
> Q: Do you have evidence to support that belief?
> A: No, that's just my opinion.

Dkt. 80-1 at 16.

The undisputed facts, taken as a whole, also show that the point of contention in the weeks leading up to Stewart's termination was not her race but potential accommodation for her disability.  What's more, FCA has provided evidence of a non-discriminatory reason for Stewart's termination—her failure to report to work for five consecutive days without explanation despite being told to do so.  Dkt. 80-4 at 3; Dkt. 80-3 at 32–33; *see also* dkt. 80-2 at 22–23.  These facts are supported by the record, and Stewart has not contested them.  Accordingly, Stewart has failed to create a genuine issue of material fact as to whether her race was the but-for cause of her termination.

*     *     *

Summary judgment for FCA is therefore **GRANTED** on Count V, racial discrimination in violation of 42 U.S.C. § 1981.

## C.   Interference & Retaliation

Finally, FCA seeks summary judgment on Stewart's claims for interference and retaliation.  It argues she cannot show a causal connection between her protected activity and the termination of her employment.

A causal connection is required for both claims.  To show interference in violation of the ADA, Stewart must show

> (1) she engaged in activity statutorily protected by the ADA; (2) she was engaged in, or aided or encouraged others in, the exercise or enjoyment of ADA protected rights; (3) the defendants coerced, threatened, intimidated, or interfered on account of her protected activity; and (4) the defendants *were motivated by* an intent to discriminate.

*Frakes v. Peoria Sch. Dist. No. 150*, 872 F.3d 545, 550–51 (7th Cir. 2017) (emphasis added).  For her retaliation claim, Stewart must show (1) she engaged in statutorily protected activity; (2) FCA took adverse action against her; and (3) the protected activity *caused* the adverse action. *Brooks v. City of Pekin*, 95 F.4th 533, 539 (7th Cir. 2024).

Of the facts before the Court, only one suggests in any way that Stewart's termination was because of her protected activity: the timing of her termination.  On January 16, 2024, Stewart requested an ADA accommodation from FCA.  Dkt. 80-3 at 21–22.  FCA terminated her employment on March 20, 2024, two months later.  But no reasonable jury could find that this timing alone is enough to show that Stewart's termination was caused by her accomodation request.

While a causal connection can be proven by circumstantial evidence, the Seventh Circuit instructs that "suspicious timing alone rarely establishes

16

causation." *Parker v. Brooks Life Sci., Inc.*, 39 F.4th 931, 937 (7th Cir. 2022) (cleaned up). In *Parker,* a receptionist was terminated just two days after requesting an accommodation. There, after the receptionist's request but before her termination, her employer learned she had violated the company's paid time off policy. This intervening event broke any causal link between the protected activity and the adverse action. *Id.* That same logic applies here. Two months after Stewart requested an accommodation, Stewart called out from work for five days. She did not explain these absences as required by FCA policy. Only after she missed work did the company terminate her employment.

Moreover, FCA clearly informed Stewart that it was still reviewing her accommodation request at the time she was told to return to work. Dkt. 80-3 at 32–33. Stewart also confirmed that she understood that returning to work at KCP was a precondition for remaining eligible for transfer to another facility. Dkt. 80-2 at 22–24. Yet, she refused to return to work in any case because she had decided long ago never to return to KCP. Dkt. 80-2 at 7 ("I knew I wasn't going to be back"). These facts are fundamentally incompatible with Stewart's theory that the timing of her termination proves that her accommodation request caused her termination.

In sum, the material undisputed facts presented by FCA show that no reasonable jury could conclude FCA terminated Stewart because it disfavored her ADA accommodation request or reports to outside entities. Summary judgment in FCA's favor is therefore **GRANTED** as to Counts III and IV.

17

## IV. CONCLUSION

FCA's motion for summary judgment on Stewart's claims for racial discrimination, discrimination on the basis of her disability, failure to accommodate, interference, and retaliation is **GRANTED**. Dkt. [79]. Final Judgment shall issue by separate entry.

**SO ORDERED.**

Date: 7/23/2026

Justin R. Olson
United States District Judge
Southern District of Indiana

Distribution:

Phyllis Stewart
2222 N. Armstrong Street
Kokomo, IN 46901

John A. Drake
Ogletree Deakins
john.drake@ogletreedeakins.com

Kate Elizabeth Trinkle
Ogletree Deakins
kate.trinkle@ogletreedeakins.com